2014 COA 105

**Jeffrey L. WAINSCOTT, Personal Representative of the Estate of Donald L. Wainscott; and Rena Wainscott, Plaintiffs–Appellees and Cross–Appellants,**

v.

**CENTURA HEALTH CORPORATION, d/b/a Centura Health, Defendant–Appellant and Cross–Appellee.**

Court of Appeals No. 13CA0995

Colorado Court of Appeals, Div. I.

Announced August 14, 2014

---

Purvis Gray, LLP, John A. Purvis, Boulder, Colorado, for Plaintiffs–Appellees and Cross–Appellants.

Polsinelli PC, Sean R. Gallagher, Megan E. Harry, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by JUDGE NAVARRO

¶ 1 In this case, we consider whether substantial compliance may be sufficient to satisfy the filing and notice provisions of Colorado's hospital lien statute. Because minor filing and notice deficiencies should not invalidate an otherwise valid hospital lien, we conclude that substantial compliance suffices. A lienholder substantially complies when it satisfies the statute's purposes through timely actual notice of the lien to those against whom the lienholder attempts to enforce the lien.

¶ 2 Defendant, Centura Health Corporation (Centura), appeals the district court's partial summary judgment in favor of plaintiffs, Jeffrey L. Wainscott (as personal representative of the Estate of Donald L. Wainscott) and Rena Wainscott (collectively, the Wainscotts). The court declared that Centura's failure to strictly comply with the hospital lien statute rendered its lien unenforceable. We reverse because we are persuaded that Centura's notice fulfilled the purposes of the statute, resulting in substantial compliance.

¶ 3 The Wainscotts cross-appeal the district court's order dismissing their claims under the Colorado Consumer Protection Act and for fraudulent concealment. We affirm the dismissals because the Wainscotts failed to state claims upon which relief can be granted.

## I. Background

¶ 4 Donald Wainscott was injured in an auto accident caused by third parties (the tortfeasors). He received treatment at St. Anthony Central Hospital, which is managed and operated by Centura.

¶ 5 To secure payment of these medical expenses, Centura asserted a statutory hospital lien against any settlement or judgment that Donald Wainscott might receive as a result of the accident. But Centura did not comply with all of the statute's filing and notice requirements. *See* § 38–27–102, C.R.S.2013. Specifically, Centura did not identify in its lien filing the tortfeasors responsible for Donald Wainscott's injuries and did not serve a copy of the notice on them. But Centura did identify and serve the tortfeasors' insurer as well as Donald Wainscott.

¶ 6 Nearly two years after Centura had asserted its lien, Donald Wainscott and his wife Rena (who claimed loss of consortium) entered into a settlement agreement with the tortfeasors and their insurer. The Wainscotts then sued Centura seeking a declaratory judgment invalidating Centura's lien. They also challenged the lien amount as reflecting unreasonable and unnecessary charges. In addition, they asserted claims for violation of the Colorado Consumer Protection Act (CCPA), §§ 6–1–101 to –1121, C.R.S.2013, fraudulent concealment, negligent misrepresentation, and fraudulent misrepresentation.[1]

¶ 7 The district court dismissed the CCPA and fraudulent concealment claims for failure to state a claim. The court then granted partial summary judgment for the Wainscotts on their action for declaratory judgment, and declared the lien invalid.

¶ 8 The parties stipulated to dismissal of the remaining claims without prejudice, conditioned on the agreement that these claims would be revived if an appellate court remanded the matter to the district court for any reason. The district court entered judgment on the declaratory relief, CCPA, and fraudulent concealment claims, and certified them for appeal under C.R.C.P. 54(b).

## II. Centura's Hospital Lien

¶ 9 When a hospital provides medical care to an injured person who later obtains a judgment or settlement against a third party who caused the injury, the hospital has a lien for the costs of the medical care upon the amount payable to the injured person out of the judgment or settlement:

> Every hospital ... which furnishes services to any person injured as the result of the negligence or other wrongful acts of another person ... shall, subject to the provisions of this article, have a lien for all

---

1. While this case was pending in the district court, Donald Wainscott died, and his estate was substituted as a party.

reasonable and necessary charges for hospital care upon the net amount payable to such injured person ... out of the total amount of any recovery or sum had or collected ... by such person ... as damages on account of such injuries.

§ 38–27–101, C.R.S.2013.

¶ 10 To perfect the lien, the hospital must file a lien notice with the secretary of state and send a copy to specified persons:

Such lien shall take effect if, prior to any such judgment, settlement, or compromise, a written notice of lien containing the name and address of the injured person, the date of the accident, the name and location of the hospital, and the name of the person alleged to be liable to the injured person for the injuries received is filed by the hospital in the office of the secretary of state.... Within ten days after such filing, the hospital shall mail by certified mail, return receipt requested, a copy of said notice to such injured person at the last address provided to the hospital by such person, to his or her attorney, if known, to the persons alleged to be liable to such injured person for the injuries sustained, if known, and to the insurance carriers, if known, which have insured such persons alleged to be liable against such liability.

§ 38–27–102.

¶ 11 One who has received notice of the lien has a duty not to impair the hospital's rights thereunder. Section 38–27–103, C.R.S.2013, states, in relevant part:

Any person ... who pays over any money to any such injured person, his attorney, heirs, assigns, or legal representatives against whom there is a lien as provided in this article of which he has received notice as provided in this article is liable to the hospital having such lien for the amount thereof not exceeding the net amount paid to such injured person, his heirs, assigns, or legal representatives.

Thus, if a person pays settlement funds to the injured person despite notice of a hospital lien, he or she may be liable to the hospital. *Id.*; *see Trevino v. HHL Fin. Servs., Inc.*, 945 P.2d 1345, 1349 n. 8 (Colo.

1997) ("[B]y filing and giving notice of a proper hospital lien, [the defendants] were able to hold any person against whom there was such a lien and who paid any money to [the injured person] liable for the amount of the hospital lien up to the net amount paid.").

### A. Standing

¶ 12 The Wainscotts asked the district court to declare that Centura's lien was not valid because Centura did not comply with the notice provisions of section 38–27–102. Centura contends that the Wainscotts lack standing to contest the lien because they suffered no injury from the deficiency in the notice (given that they had actual notice of the lien).

¶ 13 Standing presents a threshold jurisdictional question. *City of Greenwood Vill. v. Petitioners for Proposed City of Centennial*, 3 P.3d 427, 436 (Colo.2000). Whether a plaintiff has standing to sue is a question of law that we review de novo. *Barber v. Ritter*, 196 P.3d 238, 245 (Colo.2008).

¶ 14 In Colorado, the definition of standing is broad and "has traditionally been relatively easy to satisfy." *Ainscough v. Owens*, 90 P.3d 851, 856 (Colo.2004). To have standing, a plaintiff must have suffered an injury in fact to a legally protected interest. *Id.* at 855. To assess whether a plaintiff has suffered an injury in fact, we accept as true the allegations of the complaint. *Id.* at 857.

¶ 15 The Wainscotts sought relief under the Uniform Declaratory Judgments Law, §§ 13–51–101 to –115, C.R.S.2013. Under this law, any person whose rights, status, or other legal relations are affected by a statute "may have determined" any question of construction or validity arising under the statute and may "obtain a declaration of rights, status, or other legal relations thereunder." § 13–51–106, C.R.S.2013; C.R.C.P. 57(b).

¶ 16 The purpose of the declaratory judgment law is to afford parties judicial relief from uncertainty and insecurity with respect to their legal relations. § 13–51–102, C.R.S.2013. Because it is a remedial statute, it must be "liberally construed and administered" to accomplish its purpose. *Id.*; *see Mt. Emmons Min. Co. v. Town of Crested*

*Butte,* 690 P.2d 231, 240 (Colo.1984). Thus, "the required showing of demonstrable injury is somewhat relaxed in declaratory judgment actions." *Mt. Emmons,* 690 P.2d at 240; *see also* § 13–51–105 (Courts "have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed."); C.R.C.P. 57(a) (same).

¶ 17 A declaratory judgment action is appropriate "when the rights asserted by the plaintiff are present and cognizable ones." *Farmers Ins. Exch. v. Dist. Court,* 862 P.2d 944, 947 (Colo.1993); *see also Bd. of Cnty. Comm'rs v. Bowen/Edwards Assocs., Inc.,* 830 P.2d 1045, 1053 (Colo.1992) (Standing requires "an existing legal controversy that can be effectively resolved by a declaratory judgment."). "[T]he essential requirement is that all relevant events have occurred, so that the court is addressing a present dispute." *Villa Sierra Condo. Ass'n v. Field Corp.,* 878 P.2d 161, 165 (Colo.App. 1994).

¶ 18 The Wainscotts alleged that they had reached a settlement agreement with the tortfeasors and their insurer, and that Centura had asserted a lien against the settlement funds before disbursement. If the lien were valid, the tortfeasors' insurer would be compelled to disburse a portion of the settlement funds directly to Centura, or else risk liability to Centura. According to the complaint, the tortfeasors' insurer had not disbursed the settlement funds to the Wainscotts due to the dispute about the lien.

¶ 19 The validity of Centura's hospital lien thus dictates whether the Wainscotts will receive the settlement funds. If the lien is valid, the Wainscotts might never receive *any* of the funds. But, if the lien is not valid, they will receive more than $600,000 that will remain after satisfaction of their attorney's lien, and Centura will have only its cause of action or right to payment for the medical care provided. *See Trevino,* 945 P.2d at 1349.

¶ 20 A declaration addressing the validity of Centura's statutory lien would resolve the uncertainty over whether the Wainscotts are entitled to receive the funds. *See* §§ 13–51–102, –106. We therefore conclude that the Wainscotts have alleged an injury that is "sufficiently direct and palpable to allow a court to say with fair assurance that there is an actual controversy proper for judicial resolution." *Bd. of Cnty. Comm'rs v. Colo. Oil & Gas Conservation Comm'n,* 81 P.3d 1119, 1122 (Colo.App.2003) (citing *O'Bryant v. Pub. Utils. Comm'n,* 778 P.2d 648 (Colo.1989)).

¶ 21 Centura's argument to the contrary mistakes the nature of the alleged injury. It is not the deficiency in the notice of lien that allegedly prejudices the Wainscotts. Instead, it is the existence of the lien itself that prejudices them. *See Via Christi Reg'l Med. Ctr., Inc. v. Reed,* 298 Kan. 503, 314 P.3d 852, 864 (2013) (*Via Christi II*) (acknowledging the "economic reality of the [hospital] lien's long-time operation as an encumbrance on thousands of dollars that would otherwise have been paid to [the injured person] shortly after his settlement with [the tortfeasor]"). Accordingly, we hold that the Wainscotts have standing to seek a declaration as to the validity of Centura's hospital lien.

## B. Preservation of the Issue for Appeal

¶ 22 We reject the Wainscotts' contention that Centura failed to preserve for appeal the question whether substantial compliance is sufficient to satisfy the hospital lien statute. This question was at the heart of the summary judgment arguments in the district court. And the crux of the court's order was its conclusion that, although Centura substantially complied with section 38–27–102, Centura's failure to strictly comply rendered its lien unenforceable. The question of what degree of compliance is necessary to satisfy the statute was thus preserved for review. *See People v. Melendez,* 102 P.3d 315, 322 (Colo.2004) (no talismanic language is required to preserve particular arguments for appeal, so long as the trial court is presented with an adequate opportunity to make findings of fact and conclusions of law on the issue).

## C. Standard of Review

¶ 23 We review de novo the grant of summary judgment. *McCarville v. City of Colorado Springs,* 2013 COA 169, ¶ 5, 338 P.3d 1033. "Summary judgment is appropriate

when the pleadings and supporting documents establish that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Gibbons v. Ludlow*, 2013 CO 49, ¶ 11, 304 P.3d 239.

## D. Statutory Interpretation of Requisite Compliance

¶ 24 The question whether the filing and notice requirements of section 38–27–102 demand strict compliance presents an issue of statutory interpretation, which we review de novo. *See Grandote Golf & Country Club, LLC v. Town of La Veta*, 252 P.3d 1196, 1200 (Colo.App.2011). In other words, "[n]ot all directives and requirements declared in statute law should be understood to have equal force[,]" and therefore, "[w]hether less than full compliance with particular provisions is permitted is an issue of statutory construction." 3 Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutory Construction* § 57:1, at 6 (7th ed. 2012) (*Sutherland*). "No statutory provisions are intended by the legislature to be disregarded; but where the consequences of not obeying them in every particular are not prescribed, the courts must judicially determine them." *Id.* at 2 (collecting cases); *cf. Grandote*, 252 P.3d at 1201 (Statutes that "plainly declare ... the consequence of noncompliance ... indicate[ ] an intent to require strict compliance.").

¶ 25 Compliance involves the act of conforming to official requirements and typically "connotes an element of degree." *Woodsmall v. Reg'l Transp. Dist.*, 800 P.2d 63, 67 (Colo.1990). "Strict compliance leaves no margin for error and even technical deficiencies may be unacceptable." *Grp., Inc. v. Spanier*, 940 P.2d 1120, 1122 (Colo.App. 1997). "Substantial compliance is less than absolute, but still requires a significant level of conformity." *Id.*

¶ 26 "In determining whether a statutory notice requirement has been satisfied, courts require a degree of compliance consistent with the objective sought to be achieved by the legislation under consideration." *Id.*; *accord Woodsmall*, 800 P.2d at 67; *see Finnie v. Jefferson Cnty. Sch. Dist.*

*R–1*, 79 P.3d 1253, 1258 (Colo.2003) ("[T]he purposes behind the statute are critical" in determining whether a person complied with notice requirements.); 3 *Sutherland* § 57:1, at 2–3 (Courts "must consider the importance of the literal observance of the provision in question to the object of the legislation."). "[I]n the absence of explicit statutory language requiring it, a statute requiring the providing of notice by a specified means need not be strictly applied." *Feldewerth v. Joint Sch. Dist. 28–J*, 3 P.3d 467, 471 (Colo.App. 1999); *see also* 3 *Sutherland* § 57:3, at 34 (Strict compliance may not be necessary if a statute "merely requires certain things to be done and nowhere prescribes results that follow.").

¶ 27 Identifying the degree of compliance that is consistent with the objectives of the statute fulfills our duty "to ascertain and give effect to the legislative purpose underlying a statutory enactment." *Johnson v. Indus. Comm'n*, 761 P.2d 1140, 1144 (Colo. 1988) (internal quotation marks omitted).

## E. The Purposes of the Hospital Lien Statute

¶ 28 Because "the purposes behind the statute are critical" when assessing compliance with notice requirements, *Finnie*, 79 P.3d at 1258, we consider both the general purposes of the hospital lien statute and the specific purposes of the filing and notice requirements of section 38–27–102.

¶ 29 "The obvious intent of the hospital lien statute is to protect hospitals that provide medical services to an injured person who may not be able to pay but who may later receive compensation for such injuries which includes the cost of the medical services provided." *Rose Med. Ctr. v. State Farm Mut. Auto. Ins. Co.*, 903 P.2d 15, 16 (Colo.App.1994) (citing Annotation, *Construction, Operation, and Effect of Statute Giving Hospital Lien Against Recovery from Tortfeasor Causing Patient's Injuries*, 16 A.L.R.5th 262 (1993)). Our supreme court has observed that "[t]he legislature clearly intended to offer hospitals additional protection for medical services debts by enacting

the hospital lien statute." *Trevino*, 945 P.2d at 1350.

¶ 30 Other state courts have similarly recognized that a purpose of hospital lien statutes is to "lessen the burden on hospitals and other medical providers imposed by non-paying accident cases." *Blankenbaker v. Jonovich*, 205 Ariz. 383, 71 P.3d 910, 914 (2003) (internal quotation marks omitted); *accord Bergan Mercy Health Sys. v. Haven*, 260 Neb. 846, 620 N.W.2d 339, 345 (2000). Providing a collection mechanism for hospitals also "furthers the important policy of reducing the amount of litigation that would otherwise be necessary to secure repayment of the health care debts." *Cmty. Hosp. v. Carlisle*, 648 N.E.2d 363, 365 (Ind.Ct.App.1995); *accord Bergan Mercy Health*, 620 N.W.2d at 346 (Hospital lien statute "helps the patient because it provides a measure of security to the health care provider[,] thereby diminishing or eliminating altogether the need to pursue other collections efforts.").

¶ 31 Statutes authorizing hospital liens also benefit the public by encouraging hospitals to treat patients without first determining their ability to pay. In other words, hospital lien statutes "were designed with a dual purpose: to ensure that injured patients would be quickly treated and to protect health-care providers financially, so that they could continue to provide care, especially trauma care." *Via Christi Reg'l Med. Ctr., Inc. v. Reed*, 45 Kan.App.2d 356, 247 P.3d 1064, 1068 (2011) (*Via Christi I*), *rev'd*, 298 Kan. 503, 314 P.3d 852 (2013).[2] Although most hospital lien statutes were enacted during the Great Depression to protect hospitals financially burdened by treating many patients who could not afford to pay for treatment, those "public purposes are no less important today than when the statutes were adopted." *Id.*; *see Buchanan v. Beirne Lumber Co.*, 197 Ark. 635, 124· S.W.2d 813, 815 (1939) (Lien statutes encourage hospitals to extend services to injured persons, without regard to their ability to pay, "by providing the best security available to assure compensation."); *In re Estate of Cooper*, 125 Ill.2d 363, 126 Ill.Dec. 551, 532 N.E.2d 236, 238 (1988) (hospital lien statutes were enacted to promote the health, safety, comfort, and well-being of the community).

¶ 32 Thus, hospital lien statutes are remedial in nature. *See, e.g., Via Christi I*, 247 P.3d at 1068 (Hospital liens serve the public purpose of "assuring that needed medical treatment is readily available to those who have been injured" and should therefore be liberally construed.); *Bergan Mercy Health*, 620 N.W.2d at 345 (Hospital lien statute is remedial and must therefore "be so construed as to give full force and effect to the remedy, in view of the beneficial purpose."); *accord Ex Parte Univ. of S. Ala.*, 761 So.2d 240, 244 (Ala.1999); *Krause v. Merickel*, 344 N.W.2d 398, 402 (Minn.1984).

¶ 33 In sum, the general purposes of the hospital lien statute are to provide hospitals with: (1) protection against financial losses resulting from personal injury cases; (2) a more secure method for collecting payment for treating persons injured by others; and (3) an incentive to treat injured persons without first determining their ability to pay. These purposes benefit the public by ensuring that injured persons have access to emergency medical care.

¶ 34 We also consider the specific purposes of the filing and notice provisions of section 38–27–102. The objective of the filing requirement is to place any potentially liable parties on constructive notice that the hospital has a lien against any settlement or judgment involving the injured person. *See Hicks v. Londre*, 107 P.3d 1009, 1012 (Colo. App.2004) (recording a lien provides constructive notice of it), *aff'd*, 125 P.3d 452 (Colo.2006); *Macon–Bibb Cnty. Hosp. Auth. v. Nat'l Union Fire Ins. Co.*, 793 F.Supp.

---

2. We acknowledge that the Kansas Supreme Court reversed the judgment of the Kansas Court of Appeals. *Via Christi Reg'l Med. Ctr., Inc. v. Reed*, 298 Kan. 503, 314 P.3d 852 (2013). But the Kansas Supreme Court did not dispute the intermediate appellate court's description of the hospital lien statute's purposes. Indeed, the Kansas Supreme Court did not rely at all on the statute's purposes in deciding that strict compliance with the statute is required. *Id.* at 863. In contrast, our supreme court has held that considering the statute's purposes is critical to understanding the necessary degree of compliance. *See, e.g., Woodsmall v. Reg'l Transp. Dist.*, 800 P.2d 63, 67 (Colo.1990).

321, 325 (M.D.Ga.1992) (applying Georgia law; purpose of filing a hospital lien is to provide constructive notice); *Andrews v. Samaritan Health Sys.*, 201 Ariz. 379, 36 P.3d 57, 64 (App.2001) (same); *Rolla Cmty. Hosp., Inc. v. Dunseith Cmty. Nursing Home, Inc.*, 354 N.W.2d 643, 650–51 (N.D.1984) (same); *see also Tankersley v. Parkview Hosp., Inc.*, 791 N.E.2d 201, 205 (Ind.2003) (The object of requiring liens to be filed in a public office "is to provide notice to persons who did not receive an actual copy or who enter the scene after the pertinent mechanical events have been completed.").

¶ 35 The purpose of the notice (or, mailing) provision is to ensure that relevant persons known to the hospital at the time of filing are also given actual notice of the lien. *See* § 38–27–102; *Via Christi I*, 247 P.3d at 1069 (Notice requirement "ensures that the third party doesn't incur liability for unknowingly failing to satisfy the lien.").

¶ 36 Some courts have observed, however, that "if actual notice [of a hospital lien] has been accomplished or if the party or parties had or have actual notice[,] the need for filing or recording in order to accomplish constructive notice is not necessary." *Rolla Cmty. Hosp.*, 354 N.W.2d at 650; *accord Bd. of Trs. of Univ. of Ala. in Interest of Univ. of Ala. Hosp. v. Am. Res. Ins. Co., Inc.*, 5 So.3d 521, 531 (Ala.2008) (*Univ. of Ala.*); *Thomas v. McClure*, 236 Ga.App. 622, 513 S.E.2d 43, 45 (1999). This observation finds support in Colorado. *See Prutch v. Ford Motor Co.*, 618 P.2d 657, 661 (Colo.1980) (When "the purposes of the notice requirement have been fully served by actual notice, the notice provision should not operate as a technical procedural barrier."); *Cole v. Welch*, 70 Colo. 203, 206, 199 P. 487, 489 (1921) ("[A]ctual notice is quite as potent and effective as," and thus "the full equivalent" of, constructive notice.); *Clark v. O'Donnell*, 68 Colo. 279, 286, 187 P. 534, 537 (1920) ("A person having actual notice is in a better position to protect himself than if he merely had the constructive notice resulting from the filing of the statutory notice.").

¶ 37 To recap, the purposes of the filing and notice provisions of section 38–27–102 are to supply constructive notice to all

(by filing) and actual notice to known persons with an interest in the lien (by mailing copies of the filed notice). "[N]otice informs the adverse party of the claim and thereby prevents that party from making a settlement in disregard of the lien." *Jayko v. Fraczek*, 359 Ill.Dec. 433, 966 N.E.2d 1121, 1127 (Ill.App. Ct.2012). Constructive and actual notice represent different methods designed to achieve the same end.

¶ 38 With these statutory purposes in mind, we now discuss the degree of compliance necessary to satisfy the hospital lien statute.

### F. Compliance with Filing and Notice Requirements: Strict or Substantial?

¶ 39 The Wainscotts contend that a division of this court in *Rose Medical Center* decided that strict compliance is necessary when it observed that "[a] hospital lien may be perfected only by following certain statutory requirements." 903 P.2d at 16. The division did not address, however, whether "following" those requirements necessitated strict or substantial compliance.

¶ 40 As explained below, we are persuaded that a hospital's failure to strictly comply with section 38–27–102 does not necessarily invalidate its lien. Rather, substantial compliance is sufficient to fulfill the purposes of the filing and notice requirements, and a hospital substantially complies when it provides timely actual notice of the lien to all persons against whom the lienholder attempts to enforce its lien. Stated differently, a hospital's compliance with section 38–27–102 renders its lien enforceable against those who have received actual notice of the lien "prior to any such judgment, settlement, or compromise" potentially affected by the lien. § 38–27–102.

#### 1. Substantial Compliance Serves the Purposes of the Hospital Lien Statute

¶ 41 A substantial compliance standard is consistent with the general purposes of the hospital lien statute to protect hospitals and facilitate their collection efforts because it

ensures that hospitals can collect upon their liens despite inconsequential technical errors. *See Cirrincione v. Johnson,* 184 Ill.2d 109, 234 Ill.Dec. 455, 703 N.E.2d 67, 69 (Ill. 1998) (invalidating a lien based on immaterial technical deficiencies is "contrary to the purpose of the lien, which is to lessen the financial burden on those who treat nonpaying accident victims"). Further, recognizing that substantial compliance is sufficient serves the purpose of incentivizing hospitals to treat injured patients by ensuring that such hospitals' lien collection efforts are not unnecessarily stymied by flaws that are functionally irrelevant. *See Via Christi I,* 247 P.3d at 1069–70 (requiring hospitals to strictly comply with third-party notice requirements when relevant parties knew about the lien "would be an unnecessary formality that would only frustrate the statute's public purpose").

¶ 42 To invariably require strict compliance could lead to the unreasonable result of denying a hospital the ability to collect on its lien because of a technical defect that is insignificant in a particular case. Such an interpretation is disfavored. *See Young v. Brighton Sch. Dist. 27J,* 2014 CO 32, ¶ 11, 325 P.3d 571 ("We will not adopt statutory constructions that defeat legislative intent or that lead to unreasonable or absurd results.").

¶ 43 A substantial compliance standard also effectuates the specific purpose of the statutory filing and notice requirements by elevating the functional effect of a hospital's effort to provide notice over strict adherence to formal details that may be immaterial under the circumstances. By focusing on whether those against whom the lien may be enforced in a particular case received actual notice, a substantial compliance standard ensures that the statutory purposes of providing notice of the lien are satisfied. *See Cirrincione,* 234 Ill.Dec. 455, 703 N.E.2d at 69 ("To invalidate the lien due to [immaterial] technicalities would serve no purpose and would worship form over substance."); *Rolla Cmty. Hosp.,* 354 N.W.2d at 651 (If actual notice exists or is given, "the need for constructive notice is eliminated.").

¶ 44 Moreover, substantial compliance is well suited for a notice provision that is not jurisdictional. *See Feldewerth,* 3 P.3d at 471 ("[I]f the *type* of notice required is not a jurisdictional requirement, actual notice may be substituted for it." (emphasis in original)); *accord EZ Bldg. Components Mfg., LLC v. Indus. Claim Appeals Office,* 74 P.3d 516, 518 (Colo.App.2003). For instance, in the context of the Colorado Governmental Immunity Act, our supreme court has required strict compliance with the deadline for filing the notice required by section 24–10–109(1) because it a "jurisdictional prerequisite to suit." *Finnie,* 79 P.3d at 1256; *see* § 24–10–109(1), C.R.S.2013 (compliance is a "jurisdictional prerequisite"). In contrast, substantial compliance is sufficient to satisfy the nonjurisdictional requirement of section 24–10–109(3), which identifies the entities and persons with whom the notice must be filed. *See Finnie,* 79 P.3d at 1256, 1262. Section 24–10–109(3)'s provisions resemble section 38–27–102's prescription of who shall be named in and notified of a hospital lien.

¶ 45 It is not surprising, therefore, that the majority of courts around the country to consider the issue have concluded that substantial compliance is sufficient to fulfill the purposes of a hospital lien statute's filing and notice provisions. *Via Christi I,* 247 P.3d at 1069 (recognizing that the "clear weight of authority" is that substantial, rather than strict, compliance satisfies hospital lien statutes (internal quotation marks omitted)); *accord In re Dueis,* 130 B.R. 83, 84–85 (Bankr. D.N.D.1991) (applying North Dakota law); *see, e.g., Macon–Bibb Cnty. Hosp. Auth.,* 793 F.Supp. at 323; *Univ. of Ala.,* 5 So.3d at 531; *Thomas,* 513 S.E.2d at 45; *Cirrincione,* 234 Ill.Dec. 455, 703 N.E.2d at 69; *Stephens v. Parkview Hosp., Inc.,* 745 N.E.2d 262, 266 (Ind.Ct.App.2001); *W. Neb. Gen. Hosp. v. Farmers Ins. Exch.,* 239 Neb. 281, 475 N.W.2d 901, 908 (1991); *Rolla Cmty. Hosp.,* 354 N.W.2d at 650–51.

¶ 46 The Wainscotts assert that such out-of-state decisions did not interpret a hospital lien statute identical to Colorado's, but they have neither identified any statutory differences nor explained why any such differences should matter. We are not convinced that

the statutory variations render inapposite these courts' view that substantial compliance may satisfy hospital lien statutes. As for those courts with a different view, we discuss their reasoning below.

### 2. Liberal Construction of a Remedial Statute in Derogation of the Common Law

¶ 47 Those courts requiring strict compliance with a hospital lien statute tend to emphasize that a statute should be strictly construed when it is in derogation of the common law. *See, e.g., In re Woodward,* 234 B.R. 519, 524 (Bankr.N.D.Okla.1999) (applying Oklahoma law; strict compliance with hospital lien perfection statute required because statutory liens are in derogation of the common law); *accord Kratz v. Kratz,* 905 P.2d 753, 756 (Okla.1995). Of course, this principle of statutory construction also applies in Colorado. *See, e.g., Daniel v. City of Colorado Springs,* 2014 CO 34, ¶ 13, 327 P.3d 891. Here, however, this principle may be in tension with the precept that "[a] remedial statute is to be liberally construed to accomplish its object." *In re R.C.,* 2013 COA 77, ¶ 8, 309 P.3d 954; *see also City of Brighton v. Rodriguez,* 2014 CO 7, ¶ 13, 318 P.3d 496; 3 *Sutherland* § 57:12, at 57 ("Remedial statutes are liberally construed in order to effect their purpose, and latitude is allowed with respect to deviations from the letter of their provisions without invalidating the intended result.").

¶ 48 Assuming that the hospital lien statute is in derogation of the common law, we resolve the tension between the competing interpretive tools by maintaining our focus on the statute's remedial purpose. Indeed, "[t]he rule that remedial statutes are construed liberally is one of the most common exceptions to the rule that statutes in derogation of the common law are construed strictly." 3 *Sutherland* § 61:3, at 360–61; *see also Jamison v. Encarnacion,* 281 U.S. 635, 640, 50 S.Ct. 440, 74 L.Ed. 1082 (1930) ("The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure."); *Benefield v. Colo. Republican Party,* 2014 CO 57, ¶ 17, 329 P.3d 262 ("[A]ll canons of construction [are] merely ... interpretive aid[s], not ... absolute rule[s]. Depending upon context and consideration of other, and often conflicting, interpretive aids, [particular statutory interpretation principles] may sometimes be more, and sometimes less, helpful in determining legislative intent."); *Volunteers of Am. Colo. Branch v. Gardenswartz,* 242 P.3d 1080, 1089 (Colo.2010) (Rice, J., dissenting) (The maxim that statutes in derogation of the common law must be strictly construed does not permit a court "to neglect its primary duty in interpreting a statute: to give effect to the intent of the General Assembly and the purpose of the statute's legislative scheme.").

¶ 49 Furthermore, our supreme court has recognized (albeit in relatively old decisions) that substantial compliance is sometimes sufficient to satisfy a statute that is in derogation of the common law. *See J.D. Best & Co. v. Wolf Co.,* 67 Colo. 42, 47, 185 P. 371, 373 (1919) (holding that, because a chattel mortgage is a derogation of the common law, "the statute must be strictly construed and substantially complied with"); *In re Dunphy's Will,* 60 Colo. 196, 199–200, 153 P. 89, 90 (1915) (acknowledging that statutes in derogation of the common law should be strictly construed, yet permitting substantial compliance with notice statute that limited the right of heirs to contest a will).

### 3. Mechanic's Lien Provisions Are Inapposite

¶ 50 Finally, we address the district court's conclusion that strict compliance with the hospital lien statute is required because that standard ostensibly applies to perfection of a statutory mechanic's lien. We disagree for two reasons.

¶ 51 First, strict compliance is not invariably necessary with respect to the *notice requirements* for mechanic's liens. *See, e.g., First Nat'l Bank v. Sam McClure & Son, Inc.,* 163 Colo. 473, 479, 431 P.2d 460, 463 (1967) (notice that mischaracterized the relationship between the parties did not invalidate mechanic's lien because the error was not alleged to have misled anyone); *FCC*

*Constr., Inc. v. Casino Creek Holdings, Ltd.,* 916 P.2d 1196, 1199 (Colo.App.1996) (substantial compliance with mechanic's lien notice statute did not render lien invalid).

■ ¶ 52 Second, the analogy is inapt because the purposes of a mechanic's lien are different from those of a hospital lien. "The primary purpose of a mechanic's lien is to benefit and protect those who supply labor, materials, or services in order to enhance the value or condition of another's property." *City of Westminster v. Brannan Sand & Gravel Co., Inc.,* 940 P.2d 393, 395 (Colo. 1997); *see* § 38–22–101, C.R.S.2013; *Ridge Erection Co. v. Mountain States Tel. & Tel. Co.,* 37 Colo.App. 477, 480, 549 P.2d 408, 410 (1976) (mechanic's liens exist to prevent unjust enrichment). Unlike hospital liens, mechanic's liens do not have a public purpose but instead protect only contractual rights between private parties. *See Sure–Shock Elec., Inc. v. Diamond Lofts Venture, LLC,* 259 P.3d 546, 548 (Colo.App.2011) (contract claim establishes the existence of the debt underlying a mechanic's lien); *Via Christi I,* 247 P.3d at 1068 (relying on the long-recognized "difference between mechanic's liens that protect contractors and hospital liens that are designed to protect both the public and hospitals"); *cf. Bergan Mercy Health,* 620 N.W.2d at 346 ("Unlike other creditors, . . . hospitals may be called upon to provide services without first ascertaining the patient's ability to pay.").

### 4. Summary

¶ 53 We hold that substantial compliance satisfies the filing and notice provisions of the hospital lien statute. We do not suggest, however, that hospitals have free rein to disregard section 38–27–102's provisions. *See* 3 *Sutherland* § 57:1, at 6 ("No statutory provisions are intended by the legislature to be disregarded[.]"). " 'Substantial compliance' does not permit a party to ignore statutory requirements." *Methodist Hosps. of Dallas v. Mid–Century Ins. Co. of Tex.,* 259 S.W.3d 358, 360 (Tex.Ct.App.2008) (combined errors in lien notice defeated a finding of substantial compliance). A hospital that omits information from its notice or fails to serve it upon those identified in the statute does so at its own risk and potential expense. *See In re Conservatorship of Marshall,* 10 Neb.App. 589, 634 N.W.2d 300, 304 (2001) (Even where substantial compliance suffices, when a hospital puts forth "no compliance whatsoever[,]" its lien is unenforceable.). While substantial compliance with the statutory filing and notice requirements is sufficient, whether a hospital has substantially complied depends on the circumstances of each case.

### G. Centura Substantially Complied With the Statute

■ ¶ 54 As discussed, to determine whether there has been substantial compliance with a statute, we consider whether the allegedly complying acts fulfilled the statute's purpose. *Grandote,* 252 P.3d at 1203. Here, the district court found that Centura substantially complied with the statute because Centura actually notified both Donald Wainscott and the tortfeasors' insurer of the lien.

¶ 55 The record confirms that the tortfeasors' insurer was aware of the lien well before the settlement of the Wainscotts' claims against the tortfeasors for an amount less than the limits of the liability policy. Because their insurer's payment under the policy will satisfy the entire settlement amount, the tortfeasors themselves are not obliged to pay the Wainscotts anything. And the tortfeasors appear to have had actual notice of the lien in any event. Their attorney signed the settlement agreement, the terms of which recognize the need to resolve the dispute between the Wainscotts and Centura over the lien. Under these circumstances, the failure to identify and serve the tortfeasors with the notice of lien had no practical effect.

¶ 56 Additionally, as the district court found, the Wainscotts "suffered no harm" as a result of Centura's noncompliance with certain portions of the statute because it is uncontested that the Wainscotts and their attorney received actual notice of the lien.[3]

---

**3.** The Wainscotts take issue with the fact that Centura mailed the lien notice to Donald Wain-

scott at his home address when it knew that he remained hospitalized at St. Anthony Central.

Indeed, their settlement agreement with the tortfeasors' insurer expressly acknowledged Centura's assertion of a lien against the settlement proceeds.

¶ 57 Finally, we are not persuaded by the Wainscotts' claim that Centura did not substantially comply with the statute because the document it filed with the secretary of state was entitled "UCC Filing Statement," instead of "Hospital Lien." This discrepancy is immaterial under the circumstances. First, section 38–27–102 does not prescribe a particular form that must be used when filing a notice of lien. Second, Centura mailed a copy of the lien notice to the Wainscotts and the tortfeasors' insurer with a cover page that was clearly entitled "Hospital Lien," cited to the hospital lien statute, and stated that Centura "claims a lien ... for hospital care." Hence, the Wainscotts do not allege that the name of the filed document misled them. *See People in Interest of Setters v. Lee*, 72 Colo. 598, 603–04, 213 P. 583, 586 (1923) ("The general rule in respect to notices is that mere informalities do not vitiate them so long as they do not mislead, and give the necessary information to the proper parties.").

¶ 58 Centura provided actual notice of the lien to all parties against whom it is attempting to enforce its lien, establishing substantial compliance with the statute.[4] Because the deficiencies in Centura's notification efforts did not thwart the purposes of the statute, they do not defeat the enforceability of Centura's lien against the Wainscotts' attorney.[5]

### III. Dismissal of CCPA and Fraudulent Concealment Claims

¶ 59 In their cross-appeal, the Wainscotts contend that the district court erroneously dismissed their CCPA and fraudulent concealment claims under C.R.C.P. 12(b)(5) for

failure to state a claim upon which relief can be granted. We disagree.

### A. Standard of Review

¶ 60 We review de novo a trial court's ruling on a motion to dismiss. *Colo. Med. Soc. v. Hickenlooper*, 2012 COA 121, ¶ 28, 353 P.3d 396. Like the trial court, "[w]e accept as true all averments of material fact contained in the complaint and view the allegations of the complaint in the light most favorable to the plaintiff." *Id.*

¶ 61 When ruling on motion to dismiss for failure to state a claim, "a court may consider only the matters stated within the four corners of the complaint and must not go beyond the confines of the pleading." *Jenner v. Ortiz*, 155 P.3d 563, 564 (Colo.App.2006). "[W]e must determine whether plaintiff has pleaded facts that, if true, are sufficient to support each claim asserted in the complaint." *Id.*

¶ 62 A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff cannot prove facts in support of the claim that would entitle the plaintiff to relief." *Dorman v. Petrol Aspen, Inc.*, 914 P.2d 909, 911 (Colo.1996). "But if the plaintiff is not entitled to relief upon any theory of the law, the complaint should be dismissed for failure to state a claim." *Colo. Med. Soc.*, ¶ 29; *see W. Innovations, Inc. v. Sonitrol Corp.*, 187 P.3d 1155, 1158 (Colo.App.2008) ("[A] complaint may be dismissed if the substantive law does not support the claims asserted.").

### B. Colorado Consumer Protection Act

¶ 63 The elements of a private claim for relief under the CCPA are: (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) it significantly impacts the public as actual or potential con-

---

But, in doing so, Centura *strictly* complied with the statute, which requires notice to be mailed to the injured person "at the last address provided to the hospital by such person." § 38–27–102, C.R.S.2013.

4. Because the relevant parties here had actual notice of the lien, we need not examine the

circumstances under which a hospital's efforts at constructive notice could constitute substantial compliance with the statute.

5. At oral argument, the Wainscotts' attorney explained that the funds have since been transferred to his law firm's trust account.

sumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Crowe v. Tull*, 126 P.3d 196, 201 (Colo.2006); *see* § 6–1–105, C.R.S.2013 (discussing deceptive trade practices).

¶ 64 In support of their CCPA claim, the Wainscotts alleged in their amended complaint that Centura engaged in unfair and deceptive trade practices by failing to disclose "during the course of [Donald Wainscott's] hospitalization" that Centura: (1) would not bill Medicare for the services provided; (2) would instead attempt to collect against the proceeds obtained from the tortfeasors' liability insurance policy; and (3) would seek to recover the full amount of charges instead of the lesser amount that Medicare would pay.

¶ 65 The Wainscotts further alleged that, had Centura informed them of its billing practices, they would have moved Donald Wainscott to a different hospital. They maintained that Centura's practices damaged their tort claims against the tortfeasors as well as their entitlement to the proceeds from their settlement with the tortfeasors. Finally, the Wainscotts asserted that Centura's practices significantly impacted the public as actual or potential customers of Centura.

¶ 66 The district court dismissed the Wainscotts' CCPA claim with prejudice after concluding that they failed to sufficiently assert that they had suffered an injury in fact to a legally protected interest. The court noted that Centura was not required to bill Medicare, and explained:

> [T]he fact of the matter is that [Centura] did not have a duty to inform them that it was going to bill in a certain way. [The Wainscotts] have cited no law requiring [Centura] to do so, and so [the Wainscotts] had no legally protected right to be so informed.

¶ 67 We agree with the district court's decision on somewhat different grounds. We conclude that the amended complaint failed to state a CCPA claim because it failed, as a matter of law, to sufficiently allege that Centura had engaged in an unfair or deceptive trade practice. Accepting as true the Wainscotts' allegations made in support of their CCPA claim, we conclude that Centura was legally required to do precisely what it did during the period of Donald Wainscott's hospitalization: refrain from billing Medicare and seek payment from the tortfeasors' liability insurer. Centura's failure to advise the Wainscotts that it was obeying the law did not constitute a deceptive or unfair trade practice.

¶ 68 Medicare is a *secondary payer* system when another insurer is responsible for providing primary coverage. 42 U.S.C. § 1395y(b)(2) (2012); 42 C.F.R. § 411.32(a)(1) (2013) ("Medicare benefits are secondary to benefits payable by a primary payer."); *Am. Hosp. Ass'n v. Sullivan*, No. CIV A 88–2027 (RCL), 1990 WL 274639, at *6 (D.D.C. May 24, 1990) (The secondary payer system was enacted "to require care providers to ascertain whether a Medicare beneficiary is covered by some other insurance and to bill that insurer first, only turning to Medicare if the insurance is not forthcoming."); *see Speegle v. Harris Methodist Health Sys.*, 303 S.W.3d 32, 36 (Tex.Ct.App. 2009) (discussing Medicare secondary payer provisions); *Laska v. Gen. Cas. Co. of Wis.*, 347 Wis.2d 356, 830 N.W.2d 252, 256 (App. 2013) (same).

¶ 69 As relevant here, Medicare does not provide coverage "to the extent that ... payment has been made or can reasonably be expected to be made ... under an automobile or liability insurance policy or plan...." 42 U.S.C. § 1395y(b)(2)(A)(ii); *see also Joiner v. Med. Ctr. E., Inc.*, 709 So.2d 1209, 1217 (Ala.1998) ("[B]y virtue of the 'secondary payer' exception, Congress has provided the statutory means by which a health services provider, which has provided medical treatment to a Medicare beneficiary, may obtain payment from a beneficiary's liability insurance proceeds, instead of from Medicare.").

¶ 70 Medicare will make conditional payment, however, if a primary liability insurer "has not made or cannot reasonably be expected to make payment ... promptly...." 42 U.S.C. § 1395y(b)(2)(B)(i); 42 C.F.R. § 411.52(a)(1) (2013). "Promptly" is

defined as within 120 days of the earlier of (1) the date a hospital lien is filed or (2) the date the patient is discharged from the hospital. 42 C.F.R. § 411.50(b) (2013). This timeframe is commonly referred to as the "promptly period." Thus, Medicare may not pay if a liability insurer pays or is reasonably expected to pay during the promptly period. *See Speegle*, 303 S.W.3d at 37; *see also Parkview Hosp., Inc. v. Roese*, 750 N.E.2d 384, 389 (Ind.Ct.App.2001) (noting that the purpose of such a prohibition is to "reduce the cost of the Medicare program"). After the promptly period, Medicare may make conditional payment, but upon judgment or settlement, the primary insurer and anyone who receives payment from it must reimburse Medicare for any conditional payments made. 42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. §§ 411.22; 411.52(b) (2013).

¶ 71 Throughout the promptly period, a medical services provider must bill the liability insurer before it may bill Medicare. *See* 42 C.F.R. § 489.20(g) (2013) (Providers agree "[t]o bill other primary payers before Medicare."); U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., *Medicare Secondary Payer (MSP) Manual*, ch. 2, § 40.2B (2009) (*MSP Manual*), available at http://www.cms.hhs.gov/manuals/downloads/msp105c02.pdf[6] ("Generally, providers ... must bill liability insurance prior to the expiration of the promptly period rather than bill Medicare. (The filing of an acceptable lien against a beneficiary's liability insurance settlement is considered billing the liability insurance.)"); *Speegle*, 303 S.W.3d at 37 (quoting same); *see also Sullivan*, 1990 WL 274639, at *9 ("Under the secondary payer provision, a Medicare recipient covered by non-Medicare insurance is only entitled to benefits, i.e. the hospital is only allowed to bill Medicare for conditional payments, *after* the claim has been presented to the private insurer or the Secretary determines that payments are not likely to be made promptly."); *Joiner*, 709 So.2d at 1220 (citing agency memoranda advising Medicare administrators that "[w]ithin the 120–day

'promptly' period, [the provider] must bill only the liability insurer, unless it has evidence that the liability insurer will not pay within the 120 day promptly period" (some internal quotation marks omitted)); *Roese*, 750 N.E.2d at 390 (same); *Laska*, 830 N.W.2d at 260 (same).

¶ 72 Here, the 120–day promptly period began on July 6, 2010, when Centura filed its lien, and ended on November 3, 2010. *See* 42 C.F.R. § 411.50(b). Donald Wainscott was discharged on August 8, 2010, while the promptly period was still in effect. Therefore, unless Centura had evidence that the tortfeasors' liability insurer was not reasonably expected to pay within the promptly period, Centura was *prohibited* from billing Medicare during the entire time that Donald Wainscott was hospitalized. *See* 42 U.S.C. § 1395y(b)(2)(B)(i); 42 C.F.R. § 411.52(a)(1); *MSP Manual*, ch. 2, § 40.2B. The Wainscotts' amended complaint is devoid, however, of any allegation that Centura could have demonstrated that the tortfeasors' insurer would not pay within that period. Thus, Centura was obligated to wait until the promptly period expired before it could bill Medicare for conditional payment.

¶ 73 Moreover, after the promptly period expires, a hospital has the option to bill Medicare for conditional payment, but it is not required to do so. Following the promptly period, a provider may either bill Medicare for payment and withdraw all liens against the liability insurance or the beneficiary's liability insurance settlement, or may instead maintain all such liens. *MSP Manual*, ch. 2, § 40.2B (2009) (quoted in *Speegle*, 303 S.W.3d at 40); *see also Joiner*, 709 So.2d at 1220 (quoting agency memos to Medicare administrators advising that, after the promptly period, the provider "may, but is not required to bill Medicare for conditional payment if the liability insurance claim is not finally resolved"); *Roese*, 750 N.E.2d at 390 (same); *Laska*, 830 N.W.2d at 260 (same). In short, after the promptly period, Centura had "the right either to bill Medicare or to maintain a lien against a potential liability

---

**6.** The MSP Manual, and specifically § 40.2, is in the appellate record; the Wainscotts relied on it in the district court.

insurance settlement." *Speegle*, 303 S.W.3d at 37–38 (concluding that hospital was entitled to recover its lien from injured patient's liability insurance settlement instead of billing Medicare).

¶ 74 Further, the MSP Manual recognizes that, when permitted by state law, a provider "may file a lien for full charges against a beneficiary's liability settlement." *MSP Manual*, ch. 2, § 40.2F. By pursuing such a lien, the provider may collect actual charges rather than the reduced amount that Medicare would pay if the provider had billed Medicare. *MSP Manual*, ch. 2, § 40.2D; *Speegle*, 303 S.W.3d at 37 (quoting same); *see also Sullivan*, 1990 WL 274639, at *2 (allowing providers to bill their full charges to liability insurers but limiting Medicare reimbursement to lower fixed rates creates an "incentive to pursue private insurance reimbursement instead of Medicare"). Hence, contrary to the Wainscotts' allegations, Centura was permitted to seek collection for the full amount of its charges and was not required to seek only the reduced amount that Medicare would have paid. *See Or. Ass'n of Hosps. v. Bowen*, 708 F.Supp. 1135, 1142 (D.Or.1989) (when a provider has never billed Medicare, its lien recovery cannot be limited to the amount that Medicare would have paid).

¶ 75 In sum, during the entire period of Donald Wainscott's hospitalization, Centura was required to seek payment from the tortfeasors' insurer, rather than bill Medicare.[7] The Wainscotts have identified no authority holding that Centura was obligated to advise them that it was fulfilling its legal obligations. And we are aware of no such authority. Centura had no duty to inform the Wainscotts that it intended to obey the law. *Cf. People v. Holmes*, 959 P.2d 406, 414 (Colo.1998) (" 'Based on the notion that the law is definite and knowable, the common law presumed that every person knew the law.' " (quoting *Cheek v. United States*, 498 U.S. 192, 199, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991))); *Dupont v. Aavid Thermal Techs., Inc.*, 147 N.H. 706, 798 A.2d 587, 591 (2002)

(" 'In the ordinary situation we indulge the assumption that people will obey the law rather than violate it.' " (quoting *Parham v. Taylor*, 402 So.2d 884, 886 (Ala.1981))); *Nat'l Convenience Stores, Inc. v. Matherne*, 987 S.W.2d 145, 149 (Tex.Ct.App.1999) ("[T]here is no duty to inform others of the requirements of the law because all persons are presumed to know the law.").

¶ 76 Because Centura's failure to advise the Wainscotts that it would pursue a hospital lien, rather than bill Medicare, did not constitute an unfair or deceptive trade practice, the district court properly dismissed the CCPA claim.

### C. Fraudulent Concealment

¶ 77 The elements of fraudulent concealment are: (1) concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 109 (Colo.2011).

¶ 78 The Wainscotts' fraudulent concealment claim was rooted in the same basic facts as their CCPA claim. They alleged that Centura concealed its intention to pursue payment from the tortfeasors' insurer (via a lien on any settlement funds) rather than bill Medicare. The Wainscotts asserted that Centura had a duty to disclose its intent to seek payment in such manner, and that they justifiably relied on their assumption that Centura would bill Medicare in deciding to continue Donald Wainscott's care at St. Anthony Central.

¶ 79 "To succeed on a claim for fraudulent concealment or nondisclosure, a plaintiff must show that the defendant had a duty to disclose material information." *Mal-*

---

7. Although the Wainscotts alleged that they would have transferred Donald Wainscott to a different hospital had they known about Centura's billing practices, they did not allege the existence of a hospital with *different* Medicare billing practices. Given the obligations of the Medicare secondary payer system, it seems unlikely that such a hospital existed.

*lon Oil Co. v. Bowen/Edwards Assocs., Inc.,* 965 P.2d 105, 111 (Colo.1998). A duty to disclose arises when material facts "in equity or good conscience" should be disclosed. *Id.* (internal quotation marks omitted). The district court concluded that the Wainscotts had identified no facts or authority establishing that Centura had a duty to disclose that it planned to pursue payment from the tortfeasors or their insurer. We agree.

¶ 80 As discussed, Centura was required by law to first seek reimbursement from the tortfeasors' insurer during the 120–day promptly period following the lien filing. During Donald Wainscott's hospitalization, Centura was prohibited from billing Medicare. Equity and good conscience did not require Centura to advise the Wainscotts that it was complying with its legal obligations—about which the Wainscotts were presumed to know.

¶ 81 Only after the promptly period expired could Centura choose either to seek conditional payment from Medicare or to attempt to collect the full amount of its lien if the Wainscotts settled with or obtained a judgment against the tortfeasors. But that choice did not become available until well after Donald Wainscott had been discharged from the hospital. Thus, Centura's billing choice was not a "material existing fact," *BP Am. Prod. Co.,* 263 P.3d at 109, at the time that the Wainscotts claim they were entitled to be informed of it. *Cf. Mehaffy, Rider, Windholz & Wilson v. Cent. Bank Denver, N.A.,* 892 P.2d 230, 237 (Colo.1995) (For a negligent misrepresentation claim, which similarly requires a material existing fact, "the misrepresentation must be of a material fact that presently exists or has existed in the past.").

¶ 82 Because Centura did not have a duty to disclose the fact that it would pursue payment through its lien against any settlement with the tortfeasors, the district court properly dismissed the Wainscotts' claim for fraudulent concealment.

## IV. Conclusion

¶ 83 The district court's dismissal of the Wainscotts' CCPA and fraudulent concealment claims is affirmed. The summary judgment as to the Wainscotts' declaratory action to determine the validity of Centura's hospital lien is reversed. The lien is enforceable. The case is remanded for further proceedings to determine whether the amount of Centura's asserted lien represents "reasonable and necessary charges" under section 38–27–101, and any other proceedings the district court may deem appropriate.

JUDGE TAUBMAN and JUDGE BERNARD concur.